**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-332-PLF-1** |
| | : | |
| **PAUL RUSSELL JOHNSON,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT PAUL RUSSELL JOHNSON'S**
**MOTION TO MODIFY CONDITIONS OF RELEASE**

The United States of America files this opposition to defendant Paul Russell Johnson's

Motion to Modify Conditions of Release, specifically to remove the home detention requirement

and discontinue location monitoring.   Defendant is charged with inflicting bodily injury on a

United States Capitol Police Officer with a deadly or dangerous weapon, in violation of 18 U.S.C.

§ 111(b).   The defendant helped lead the breach of the U.S. Capitol grounds on January 6.   He

incited others, by word and by deed, to breach the barricades and to engage in combat with the law

enforcement officers manning those barricades.   The defendant never expressed remorse for his

violent conduct on January 6; instead, he celebrated the violence and destruction by bragging later

that evening that he was "fighting cops and shit" and "slinging" them around.

The defendant's home detention and location monitoring conditions are hardly restrictive

compared to other January 6 rioters charged with assaulting law enforcement officers.   Not only

is defendant permitted to work and attend religious services, but he is also allowed to take his

children to and from football practices and games "on a near daily basis" and to roam freely within

his 14-acre property.   (Dkt. 33 at 10; *see also* Dkt. 31).   By contrast, other rioters who did not

touch law enforcement officers, let alone inflict bodily injury, and who do not pose a flight risk,

are currently subject to home incarceration with GPS monitoring and are prohibited from using or

1

accessing the Internet.   *Cf. United States v. Douglas Austin Jensen*, 21-cr-6 (Dkt. 30) (July 13, 2021).   Finally, defendant affirmatively *requested* the SmartLINK technology from which he now seeks relief.   (Dkt. 30).   Given the defendant's conduct on January 6, the weight of the evidence, and the defendant's history and characteristics, the only way to protect the community is to maintain these strict conditions of release.    If not for these conditions, the only way to protect the community would be to detain the defendant.

## **BACKGROUND**

On April 12, 2021, the United States District Court for the District of Columbia issued an arrest warrant charging defendant with one felony count of Inflicting Bodily Injury on Certain Officers, in violation of 18 U.S.C. § 111(a)(1) and (b); one count of Obstructing Law Enforcement during Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); one count of Obstruction of Justice/Congress, in violation of 18 U.S.C. § 1512(c)(2); one count of Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4); and one count of Committing an Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).   (Dkt. 1).

As described in the statement of facts, which the government incorporates herein by reference (Dkt. 1-1), the defendant was among a crowd of rioters to push metal barricades into a line of U.S. Capitol Police Officers, causing Officer O-1 (later identified in the Indictment as Officer C.E.) to fall backward, hit the stairs behind her, and suffer a concussion.



Defendant's conduct before and after the violent assault of Officer C.E. underscores the leadership role that he assumed on January 6.   As recently discovered by the government, the defendant began inciting violence before ever breaching the first set of barricades closest to the Peace Circle.   Indeed, in an open source video clip posted to Twitter,[1] the defendant, who appears to be wearing a walkie talkie on his backpack strap, shouts: "Where ya at?   Where's it at?   Get on the front line.   1776 this fence right here.   You think George Washington would be standing behind this motherfucker?"

---

[1] *See* Post by Twitter User @ElijahSchaffer on Jan. 8, 2021, *available at* https://twitter.com/ElijahSchaffer/status/ 1347708192722022402?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E13477081927220240 2%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fseditionhunters.org%2F49-afo%2F.



After breaching the first set of barricades, defendant advances toward the line of U.S. Capitol Police Officers manning the second line of barricades and shouts, "Let's go!    Fuck this shit.    We pay your bills, you back the fuck off."    When the defendant gets closer to the line of officers, he says: "It's our house.   We pay your bills.   We pay for this . . . that's some bullshit."



Then, after flattening Officer C.E. with the second line of metal barricades (described above), the defendant begins running toward the Lower West Terrace.    He stops to help an individual throw aside some metal barricades so that other rioters can more easily pass.

 



---

Later, defendant jumps atop a ledge, faces out toward the rioters on the West Front Lawn, waves them on to the Capitol grounds, and shouts: "Let's go!    Let's go!"



He is next seen standing on the West Lawn, shouting: "Raise your voices. They're [unintelligible] because they're scared now."



---

[3]  *See* The Convo Couch, "Capitol Hill – Washington D.C.: Jan. 6, 2021" YouTube (Jan. 8, 2021), *available at*

Finally, after D.C. Mayor Muriel Bowser's citywide 6:00 p.m. curfew had gone into effect, defendant is seen on an open source video standing outside the Hilton Garden Inn Hotel in Washington D.C. bragging about his assaultive conduct to an unknown individual.



JOHNSON: *Yeah, we're like we're going, we're going to the fucking Capitol. So we get to the Capitol and when we get to the street, you know where that uh statue is? At the street? Where the circle roundabout is? Way the fuck away from the Capitol. They had gates at that end, alright?*

*Me and this other guy Collins, he's in here with us. And I didn't know that he was . . . we didn't know each other for shit. I looked. I'm sitting at the gate and I've got my hands on him and there's cops. You know there's five cops standing up the way a little bit. Beyond them is a lot of cops. So me and him look at each other, we already knew what time it was . . . we started pulling the gates apart. And we started bum rushing. Cops start hightailing to the fucking Capitol, right?*

*We get to the next gate. There's three sets of gates before you get to the stairs of the Capitol. Alright? We get to the next gate. There's probably . . . there's a shit load of cops up there then. Second wing, we breached, pulled up, start throwing shit. I mean we're fu-, we're we're fighting cops and shit. I have video where I'm slinging one around . . . .*

*So we get to the third gate, they're all hightailing to the top of the Capitol. We get up on the steps. It's bolted down to the ground, the gate was. A black gate. So we grab it, we start doing this*

https://www.youtube.com/watch?v=N_T8GOytnEk&t=170s.

[4] Millennial Millie, "Police Encircle Trump Supporters at Their Hotels," YouTube (streamed live Jan. 6, 2021), *available at* https://www.youtube.com/watch?v=ObVMGPGHRe8.

*number here.   The next thing you know it's bear mace, the whole front row, dude.*[5]

On April 13, 2021, defendant was arrested on his 14-acre property in the Eastern District of Virginia.   (Dkt. 5).   As is protocol when arresting an individual who is known to possess firearms,[6] who is charged with inflicting bodily injury on a law enforcement officer, and who resides on an expansive property with several unknown structures, the FBI dispatched the SWAT team to execute an early morning arrest.

Defendant's family members were ordered out of the house so that law enforcement could secure the premises and execute a court-ordered search warrant.   FBI agents provided defendant's family members with the jackets off their backs in order to keep them warm.   The FBI agents also allowed the defendant to sit in the back of a sprinter van so that he could remain as warm and comfortable under the circumstances.

Upon entering defendant's residence, law enforcement found a handgun on the console table next to the front door, suggesting that the defendant was armed when he approached his front door.

---

[5] This transcript is a summary and is not intended to be a verbatim account of JOHNSON's words.   A Twitter user, @SeditionHunters, has also attempted to transcribe JOHNSON's statements.   *See* Untitled video published by Twitter user @SeditionHunters, *available at* https://twitter.com/SeditionHunters/status/1359900083458887685.

[6] Upon executing the search warrant for defendant's residence, officers found a total of 14 firearms.

 

Upon searching the defendant's bedroom, law enforcement found the black backpack that defendant was seen wearing on January 6.   The backpack contains a patch commonly associated with the Three Percenters.   *See* Washington Post Staff, "Identifying Far-Right Symbols That Appeared at the U.S. Capitol Riot," Washington Post (Jan. 15, 2021), *available at* https://www.washingtonpost.com/nation/interactive/2021/far-right-symbols-capitol-riot/.

 

Directly next to the backpack was an unopened canister of pepper spray.



Inside the backpack were black googles; an earpiece and black midland walkie-talkie with charger (which resembles the walkie-talkie seen on defendant's backpack strap on January 6); a collapsible baton; a female urination device in a grey bag; and several "Stop the Steal" stickers.











Also inside the defendant's bedroom, officers found a black vest plate carrier with an American flag patch that reads "Freedom Isn't Free," as well as several unsecured firearms in an open safe and underneath the bed.    The open gun safe also had an opened canister of pepper spray.



12

 

 

Inside the defendant's garage, officers found the black megaphone that defendant used during the riot on January 6, as well as the black "More Trees Less Assholes" hat that defendant was seen wearing on January 6.   Officers also found an unsecured firearm and a white megaphone that appears to have a "BIDEN 2020" sticker with two "OK" white power hand symbols on the "E" in "BIDEN."

 

 

Finally, inside a refrigerator in the defendant's garage, officers found approximately

seven two-ounce bags of marijuana.



Defendant had his initial appearance in the Eastern District of Virginia on April 14, 2021. A detention hearing was held on April 19, 2021.   (Dkt. 22).   The government was entitled to a detention hearing under 18 U.S.C. § 3142(f)(1)(A) because defendant is charged with a crime of violence – namely, 18 U.S.C. § 111(b).   *See United States v. Quaglin*, 851 F. App'x 218, 218 (D.C. Cir. 2021) (per curiam) ("Appellant is charged with violating 18 U.S.C. § 111(b) – an offense which is categorically a crime of violence.").   Though the court ultimately denied the government's request for detention, it nevertheless imposed home detention and location monitoring in order to mitigate the significant danger to the community that the defendant's release posed.   (Dkt. 22).

On April 29, 2021, the defendant had his initial appearance before Magistrate Judge Harvey in the United States District Court for the District of Columbia.   (Dkt. 20).   At the initial appearance, the defendant did not object to Magistrate Judge Harvey's re-imposition of the home detention and location monitoring conditions originally imposed by the magistrate judge in the Eastern District of Virginia.

On April 30, 2021, a federal grand jury in the District of Columbia returned a nine-count indictment charging the defendant and co-defendant Stephen Chase Randolph ("Randolph") with felony Obstruction of Law Enforcement During Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 1); Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count 2); Assaulting Certain Officers Using a Deadly or Dangerous Weapon and Inflicting Bodily Injury, in violation of 18 U.S.C. § 111(a)(1), (b) (Count 3); three felony counts relating to disorderly conduct and violence on restricted grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752 (Counts 5-7); and two misdemeanor counts relating to disorderly conduct and violence on the Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2) (Counts 8-9).   (Dkt. 15).   In addition, co-defendant Randolph was charged alone in a separate count of assault, in violation of 18 U.S.C. § 111(a)(1) (Count 4).   (*Id.*)

On June 7, 2021, the defendant filed a consent motion to modify his conditions of release. (Dkt. 30).   Specifically, the defendant requested that the Court impose SmartLINK monitoring in order to minimize any potential safety risk and discomfort to the defendant from his ankle monitor.   (*Id.* at 2).   On June 8, 2021, the Court entered an order granting the defendant's consent's motion to modify conditions of release to discontinue use of the ankle monitor in favor of SmartLINK location monitoring.   (Dkt. 31).

## APPLICABLE AUTHORITY

To determine whether conditions exist that will reasonably assure the appearance of the defendant and the safety of any person and the community, the Court must consider four statutory factors: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to

any person or the community that would be posed by the person's release."   18 U.S.C.
§ 3142(g)(1)-(4).

## ARGUMENT

The defendant was a leader and instigator of the violence and destructiveness that
enveloped the United States Capitol on January 6.   In addition to being one of the first rioters to
violently breach the restricted perimeter of the U.S. Capitol, the defendant persistently urged
rioters to commit acts of violence and destruction.   Any inconvenience that the location
monitoring technology may pose is trivial compared to the security and accountability that home
detention and location monitoring provide to the Pretrial Services Officers responsible for
supervising the defendant, as well as the community.

### 1.  Nature and Circumstances of the Offense Charged

Defendant is charged with assaulting a law enforcement officer with a deadly or
dangerous weapon and inflicting bodily injury, in violation of 18 U.S.C. § 111(b).   A violation
of § 111(b) is categorically a crime of violence.   *Quaglin*, 851 F. App'x at 218.

In *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662 (D.D.C. Feb. 26, 2021),
Chief Judge Howell outlined six helpful factors to assess the comparative culpability of a
defendant in relation to fellow January 6 rioters.   In this case, each of the *Chrestman* factors
weighs in favor of high intensity supervision for the defendant, including continued home
detention and location monitoring.

The first *Chrestman* factor is whether a defendant has been charged with felony or
misdemeanor offenses.   *Id.* at *7.   Here, defendant is charged with six serious felonies,
including inflicting bodily injury on a law enforcement officer with a deadly or dangerous
weapon, in violation of 18 U.S.C. § 111(a)(1) and (b), which carries up to twenty years'

imprisonment.    Defendant argues that "courts routinely release individuals charged with felonies on their own recognizance," but most of the cases he cites involve violations of § 111(a)(1), not § 111(b).    *See e.g.*, *United States v. Kenneth Joseph Owen Thomas*, 21-mj-44, Dkt. 1 (charging defendant with violating § 111(a) only, not § 111(b)); *United States v. Jason Douglas Owens*, 21-mj-376, Dkt. 1 (same); *United States v. Aaron Mostofsky*, 21-cr-138, Dkt. 25 (same); *United States v. Matthew Council*, 21-cr-207, Dkt. 11 (same); *United States v. Matthew Capsel*, 21-mj-122, Dkt. 1 (same).    Unlike § 111(b), a violation of § 111(a)(1) is not a categorical crime of violence.    Moreover, violations of § 111(a)(1) carry only an eight-year term of imprisonment (that is, if they involve physical contact with the victim or the intent to commit another felony), compared to a twenty-year term of imprisonment under § 111(b).

A non-exhaustive survey of January 6 cases show that similarly situated defendants charged with violating § 111(b) are either detained or under some form of location monitoring and/or home detention.    *See, e.g.*, *United States v. United States v. Luke Russell Coffee*, 21-cr-327, Dkt. 20 (defendant on home detention and location monitoring after using a crutch to push against officers, even though defendant did not actually injure any officers, merely followed the crowd onto the Capitol grounds, and at one point implored the crowd to stop and pray); *United States v. Michael Foy*, 21-cr-108, Dkt. 44 (imposing home confinement and GPS monitoring for a defendant who threw a projectile and aggressively swung a hockey stick towards law enforcement officers in the tunnel at the Lower West Terrace and who urged other protesters to move forward, even though defendant did not plan in advance to attend the rally, did not coordinate with other participants, and did not promote or celebrate the events of the day or his own actions after the fact); *United States v. Thomas Webster*, 21-cr-208, Dkt. 29 (defendant on home incarceration and GPS monitoring after striking a metal flagpole at a barrier in front of a

Metropolitan Police Department officer and tackling the officer to the ground, even though defendant is a former New York Police Department Officer with no criminal history and no flight risk).   Indeed, the Court need look no further than co-defendant Randolph to find that home detention and some form of location monitoring may be an appropriate condition for a defendant with minimal flight risk and criminal history, but who is charged with violating § 111(b).   *See* Dkt. 32.

The second *Chrestman* factor is whether the defendant engaged in prior planning before arriving at the Capitol.   *Id.* at *8.   The evidence recovered from the defendant's house suggests he did.   The defendant's black backpack contained weapons and tactical gear, including goggles, an earpiece, a walkie-talkie with a charger, and a collapsible baton.   Right next to the defendant's backpack was an unopened canister of pepper spray.   It's also plausible that defendant could have worn the black vest plate carrier recovered from his garage underneath his thick black sweatshirt on January 6.   Finally, defendant brought with him a black megaphone, which he used to encourage and direct the movements of his fellow rioters.   In short, defendant came to Washington D.C. armed and eager for battle.

The third *Chrestman* factor is whether the defendant carried or used a dangerous weapon during the riot.   *Id.*   Again, this factor weighs in favor of continued high intensity supervision of the defendant.   Defendant is charged with using the metal barricade as a deadly or dangerous weapon to inflict bodily injury on Officer C.E.   Moreover, defendant likely possessed a collapsible baton (and potentially pepper spray) in the black backpack that he was seen carrying on January 6.

The fourth *Chrestman* factor – whether the defendant coordinated with other participants before, during, or after the riot – weighs in favor of high intensity supervision.   *Id.*   In fact, the

defendant bragged in an open source YouTube video about how he coordinated with an individual named "Collins" at the Peace Circle to "bum rush" the metal barricades and to start pulling the gates apart.

The fifth factor of whether the defendant "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct" weighs strongly in favor of the defendant's continued high intensity supervision.   *Id.*   Contrary to the defendant's assertion that he "got caught up in the energy of the crowd," the video footage shows that the defendant was a leader and an instigator throughout the attack on the Capitol.   (Dkt. 33, at 9). His words and movements during the riot – the sixth *Chrestman* factor – were intended to incite, not to diffuse.   *Id.*   He urged rioters to "1776 this fence," to "join the front line," to "raise your voices" at the "scared" officers, and to jump over the ledge from the West Front Lawn and join the fray.   He personally paved the way for hundreds of rioters to enter the Lower West Terrace by flattening and clearing two lines of police barricades from the Pennsylvania Avenue Walkway.   The defendant never once paused to express remorse for his actions or to check in on the well-being of the officers he attacked.   Instead, he encouraged others to keep going.

Defendant's repeated attempts to downplay the seriousness of his words and actions on January 6 are unavailing.   The video evidence shows that defendant did not just use his megaphone to "amplify his voice in protest"; rather, defendant used his megaphone to incite violence and destruction.   (*See* Dkt. 33, at 8).   When defendant wasn't shouting into his megaphone, he was pushing and hurling metal barricades aside in order to clear the walkway toward the Capitol.   Contrary to defendant's claim that he was not "directly involved in [the] violent confrontation with the officers," the video footage shows that the metal barricades were all connected, that the rioters needed to lift more than just the barricade directly in front of

Officer C.E. in order to move the barricades forward, and that defendant was standing mere feet

away from Officer C.E. when she was pushed backward by the metal barricade.

As the D.C. Circuit has recognized, "those who actually assaulted police officers and

broke through windows, doors, and barricades, and those who aided, conspired with, planned or

coordinated such actions are in a different category of dangerousness than those who cheered on

the violence or entered the Capitol after others cleared the way."   *United States v. Munchel*, 991

F.3d 1273, 1284 (D.C. Cir. 2021).   More recently, the D.C. Circuit has recognized that a person

can be "deemed a danger to the community sufficient to justify *detention* even without posing a

threat of committing violence in the future."   *United States v. Hale-Cusanelli*, --- F.4th ---, 2021

WL 2816245, at *5 (D.C. Cir. July 7, 2021) (emphasis added).   Here, the defendant's violent

assault and his leadership in breaching the restricted perimeter of the Capitol, coupled with the

concerning items of evidence recovered from his home, amply justify continued home detention

and location monitoring.   There is a strong risk that defendant, who was discovered to own

tactical gear, pepper spray, a collapsible baton, 14 firearms, and a megaphone, could try to

engage in further destructive or assaultive conduct as a loyal Three Percenter.   The

inconvenience of having to answer his phone several times a day does not outweigh the sense of

security and accountability that the home detention and location monitoring conditions provide

to the community and to the officers responsible for supervising the defendant.

### 2.   Weight of the Evidence

The weight of the evidence against the defendant is overwhelming and incontrovertible.

The government has produced at least three different videos that depict the defendant's violent

assault of Officer C.E. from three different angles.   The government has also located additional

footage of defendant yelling into his microphone before and after the assault to encourage other

rioters to engage in violent and destructive conduct.    Finally, there is open source video footage of the defendant admitting to "pulling the gates apart," "bum rushing" the barricades, and "fighting cops and shit."    Therefore, this factor weighs strongly in favor of high intensity supervision for the defendant.

### 3.   History and Characteristics of the Defendant

Defendant appears to be affiliated with the "Three Percenters" radical militia group, as evidenced by the "III" badge on his black backpack and his remarks to "1776 this fence" and "You think George Washington would be standing behind this motherfucker?"    According to the Anti-Defamation League, Three Percenters (also referred to as "III%ers," "3%ers" or "Threepers") are "anti-government extremists who part of the militia movement.    They compare their hostility to the federal government with the opposition of American patriots to the British during the American Revolution.    The term itself is a reference to a false belief that the number of Americans who fought against the British during the Revolutionary War amounted to only three percent of the population at the time."    *See* "Three Percenters," Anti-Defamation League, *available at* https://www.adl.org/resources/backgrounders/three-percenters.    During the Trump Administration, the Three Percenters' "anti-government ire usually center[ed] on gun control or on perceived 'victims of government' militia and Three Percenters seek to protect." *Id.*    Three Percenters have also "focused on opposing left-wing activists and protesters, including anti-racist antifa activists," and have also "appeared at Trump and pro-Trump rallies around the country to provide armed 'security' against anti-Trump protesters."    Defendant's proud affiliation with the Three Percenters evinces his willingness to participate in a militia and engage in violent combat in order to pursue and further his anti-government agenda.

Defendant's possession of at least seven two-ounce bags of marijuana, notwithstanding his prior misdemeanor conviction for possessing marijuana, also evinces a plain disregard for the law.[7] His unsafe gun storage practices are similarly troubling given that he resides in a home with three young boys ages eight to fourteen.    Indeed, when FBI agents searched the defendant's residence, they found several long guns and ammunition in an unlocked gun safe, as well as a handgun on the entry table and in unsecured carriers on the floor of the defendant's bedroom.    The FBI also found a long gun on the floor of what is believed to be one of the defendant's children's bedrooms:



Finally, defendant's possession of several canisters of pepper spray, black goggles, a vest plate carrier, a collapsible baton, and walkie-talkies suggest that his involvement in the January 6 attack on the Capitol was more organized, violent, and threatening than he would have this Court believe.

As for defendant's compliance with his pre-trial conditions of release, the defendant misrepresents the position of the United States Pretrial Services Agency for the District of Columbia.    First, the defendant has not been in compliance with his conditions of release to date.    According to Pretrial Services Officer Takeysha Robinson, defense counsel was informed

---

[7] Though Virginia has recently legalized the possession of marijuana, it has only legalized the possession of an ounce of marijuana for people 21 and older.   *See* Va. Code Ann. § 4.1-100 (West 2021).

that on several occasions, the defendant failed to timely answer his phone for a SmartLINK

check-in.   Although defendant would occasionally call back, his failure to timely answer raises

concerns for Pretrial Services because it could mean that the defendant was somewhere he was

not supposed to be, and that he waited to call back until he changed locations.   Second,

according to Officer Robinson, the defendant's motion mischaracterizes her statement about

SmartLINK monitoring being more "burdensome."   (*See* Dkt. 33, at 4).   According to Officer

Robinson, while she agreed with defense counsel that the SmartLINK technology requires more

check-ins and could therefore potentially be more burdensome, she sought to underscore the fact

that defense counsel had specifically requested SmartLINK instead of an ankle monitor, and that

any further burden to defendant was one that the defendant had affirmatively requested.

### 4.   Nature and Seriousness of the Danger

The final factor is the "nature and seriousness of the danger to any person or the

community that would be posed by the person's release."   18 U.S.C. § 3142(g)(4).

Defendant's conduct in this case – violently assaulting a police officer in an effort to undermine

the certification of the 2020 presidential election and inciting others to do the same – shows a

disregard for the safety of others, the rule of the law, and the democratic process.   Indeed, "if

any crime establishes danger to the community and a disregard for the rule of law, assaulting a

riot-gear-clear police officer does."   *United States v. Fairlamb*, 2021 WL 1614821, at *5

(D.D.C. Apr. 26, 2021).

"It cannot be gainsaid that the violent breach of the [U.S.] Capitol on January 6 was a

grave danger to our democracy, and that those who participated could rightly be subject to

detention to safeguard the community."   *Munchel*, 991 F.3d at 1284-85.   In *Munchel*, the D.C.

Circuit remarked that "those who actually assaulted police officers and broke through windows,

24

doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Id.* at 1284.   Defendant's actions on January 6 place him squarely into *Munchel*'s more dangerous category.   For someone who poses such a significant threat to public safety and to the corruption of the union, defendant's conditions of release – which still enable him to leave the house during work hours, to attend religious services, to drive his children to and from football games on a daily basis, and to roam freely within his 14-acre property – constitute the least restrictive conditions to assure the safety of any person and the community.

## CONCLUSION

For the above reasons, the Court should therefore deny the defendant's Motion to Modify his Conditions of Release.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By:      /s/
HAVA MIRELL
Assistant United States Attorney
Detailee
CA Bar No. 311098
312 N. Spring St., Suite 1100
Los Angeles, CA 90012
Hava.Mirell@usdoj.gov
(213) 894-0717